The opinion of the court was delivered by
McEnery, J.
Mrs. Louisa Latchford died in New Orleans on the 25th day of October, 1888.
The administrator of her succession filed his final account, to which there were several oppositions.
*532 The succession property comprises a lot of furniture, a claim against the Germania Insurance Company, and a piece of real estate in the City of New Orleans.
The last item is the principal portion of the succession and from which arises the most serious opposition.
From the judgment of the lower court maintaining the opposition-of the Mutual Loan and Building Association and Charles Franeke, and the opposition of the Germania National Bank to the claims of Joseph Harz, and the denial of the opposition of August Bernau, attorney, the administrator and the opponents, Harz and Bernau, have appealed.
The decedent sold to the Mutual Loan and Building Company, of New Orleans, on the 21st of May, 1888, an unimproved portion of ground in the Second District of this city. The act of sale was-passed before John R. Legier, notary public, and the price was $750. The act was duly registered in the Conveyance office of Orleans parish.
This sale was the first step toward the consummation of a transaction whiph begun by the decedent’s application, dated New Orleans, April 16, 1888, addressed to the president and board of directors of the Mutual Loan and Building Company: “Gentlemen, I hereby make application for $2400 on the monthly payment plan in accordance with your usages, rules and regulations, for the purpose of' erecting a cottage costing $1650, and $750 to pay note due on- the property, as follows: Canal, between Alexander,' Murat and Cus-' tomhouse streets. (Signed) L. Latchford, St. David and Customhouse.” Which application was accepted by the following written endorsement: “We, the undersigned members of the committee on building and real estate, respectfully report that we have carefully examined the premises above described and approve the loan with 10 per cent, added. (Signed) H. Wellmann.”
This approval by the building committee was signed on the same day or day after the application was made.
Previously, Mrs. L. Latchford had purchased the property in question from one Bérgamini, on the 29th of February, 1888.
The note referred to in the application was a vendor’s note, given for the price to Bergamini. This note was taken up by the Mutual Loan and Building Company with its own money before it purchased the property, and the company being the holder of the note at the *533 ■time the property was purchased by it, constituted that note the consideration mentioned in the sale.
Having purchased the property, the company, on the 15th of May ■of the same year, entered into a contract with Otto Walther, whereby said Walther contracted to build for said company the house contemplated by the application, on or before the 1st of Jupe, 1888, for the sum of $1650, the same to be built to the satisfaction of the ■company.
The house was finished and Mrs. Latchford occupied it. Her death occurred on the 25th of October, 1888, and she was intestate.
The Mutual Loan and Building Company was incorporated February Y, 188Y, and its charter was amended February 8, 1888, the charter and amendments being by act before J. R. Legier, notary public, and -duly recorded.
The original charter was offered in evidence. In Art. 3 the objects of the corporation are declared to be for the building of dwelling houses or other buildings, according to such ideas, plans, or specifications, for any person so desiring and possessed by legal and valid title of a lot of ground within the city limits, and such person or persons to refund the price thereof to said corporation in monthly instalments equivalent to 10 per cent, per annum on the deferred payments or unpaid principal.
Also, the renting, purchasing, and sale of homesteads, and the loaning of funds on mortgage or other real estate security in the Oity of New Orleans.
The corporation is a stock corporation, the capital stock being $50,000, divided into two thousand shares of $25 each.
In Art. 1 it is given authority to hold, receive, lease, purchase, and convey under its corporate name property both real and personal, to loan money on security, to make and appoint such officers, directors, and agents as the necessity and convenience of the corporation may require, and to make and establish such by-laws, rules, and regulations for the [proper management of its affairs as may be necessary and proper, and to do and perform all other acts and things which may be requisite and necessary to carry out the objects and purposes of the corporation.
In Art. 6 it is provided that should any borrower from this company fail or neglect to pay his or her monthly instalments at such times .as the same may fall due and as may be provided for in his or her *534 contract, such unpaid instalments shall .then become part of the principal and bear interest at the same rate.
Art. 7 provides that all expenses of attorneys, notaries, architects, and recorders in making or canceling loans, shall be paid by the respective borrowers before title is passed to them, and no title shall be executed until said charges are paid.
Art. 10 provides that any borrower shall have the right at any time to reduce said indebtedness by paying on account a sum of not less than $10, and all payments on account of capital shall at the end of each borrower’s current year be' deducted from the principal, and the payments on account of the principal and interest shall thereafter continue on the reduced capital without curtailment of the original time within which the loan was made payable.
Art. 2 of the by-laws creates the different committees necessary to carry on the business of the company, and among others a building and real estate committee, whose duties are to examine all houses which are being erected by the company, and to see that they are built in strict conformity with the specifications. They shall also appraise any house or lot offered to the company.
Art. 7 provides that no real estate shall be purchased until the saíne has been appraised, and the purchase thereof recommended by the building and real estate committee, and the title thereto approved by the attorney of the company. The president shall then, upon receiving from the applicant such sum as may be fixed by the board of directors upon the recommendation of the building and real estate committee, buy the property in the name of the company, and thereafter, in due course, convey same to said applicant, upon such terms and conditions as may be fix.ed by the board of directors.
Art. 8, Sec. 1, provides that any person who owns or may acquire a lot of ground can obtain a loan from the company for building purposes, if the said lot be acceptable to the company, provided he transfers to the company the said lot free of all encumbrances, and thereafter a sale shall be made to him in due course, as provided in Art.'7, and after the building is completed.
After the house was erected, she, averring that she did not have enough money to pay the attorney’s and notary’s fee for the examination of the title and the passing of the act of sale, requested that the property be not immediately retransferred to her.
*535 The property was to remain in the company’s name until she-refunded the amount borrowed and the 10 per cent., but she had the right to demand the transfer at any time, subject to the vendor’s lien of $2640.
The company was ready to transfer it to her at any time after the completion of the house by the company.
Her instalments and interests fell due on the 18th of each month, and when it was not paid it was charged up and added to the $2640, and anything paid after that date was deducted from the total.
The cost of erecting the house was $1650, and was paid by the company, making a total of $2400 paid by the company for account of Mrs. L. Latehford.
It is a rule and regulation of the company to add 10 per cent, to the amount 'paid out, and there was a special agreement to that effect with Mrs. Latehford.
The whole sum is then divided into 120 monthly instalments,, bearing interest at the rate of 8 per cent., payable also monthly, .and forms the consideration or price at which the company agrees to sell to the borrower or purchaser.
At the time of Mrs. Latchford’s death the real estate in the inventory was in the name of the Mutual Loan and Building Company. It was, however, inventoried as the property of Mrs. Latehford, and the following entry was made in the inventory after describing the property: “By an act before J. R. Legier, notary public, dated May 21, 1888, the late Mrs. Louisa Latehford,transferred to the Mutual Loan and Building Company, of New Orleans, the said property for the sum of $'750 cash. It appears, however, that the said sale of the property was made to the said association for the purpose of securing a loan of money for the purpose of erecting a building on the above described property, which was then unimproved, which sum of money originally amounted to the sum of $2640, less 10 per cent., to-wit, $2316, part of which amount of money, namely, $150, was used to extinguish a mortgage note resting on the property, so as to clear the property and thus secure the loan by the company to Mrs. Latehford, and this $150, so apparently paid to Mrs. Latehford, was' never paid to her, but was used as above set forth to extinguish a note due by her so as to better secure the company. The above amount is subject to reduction by payments.” (The Mutual Loan andJBuilding Company was not party to this inventory.)
*536 The administrator provoked an order of sale on November 20, 1888, requesting that the property should be sold on terms of one-third or more cash, and the balance on one or two years’ credit at 8 per cent, interest at the purchaser’s option, secured by vendor’s lien and privilege.
The sale was asked to pay debts, and the Mutual Loan and Building Company was classed as a creditor for the amount of $2450. On the 26th of November, 1888, the administrator obtained a rule upon the Mutual Loan and Building Company, alleging that, though apparently belonging to the said company, the real property aforesaid is verily the property of the succession, for the reasons set forth in the said inventory, and referring to an order previously rendered, directing a sale at public auction to pay debts, asked that the company show cause why the property should not be sold by the administrator of the succession.
This rule was not tried, but on the 14th of December, 1888, the following joint motion was filed in the said succession:
“ On motion of H. P. Dart, attorney for the Mutual Loan and Building Company, of New Orleans, and of Aug. Bernau, attorney for P. H. Mentz, administrator of the succession of Louisa Latch-ford, and on suggesting to the court that both said company and succession claim title to the real property herein inventoried as belonging to the succession, and on further suggesting to the court that your Honor has heretofore ordered the sale of the said property, in order to pay the debts of the succession, and it is necessary that the said property be sold at public auction, and that the rights of the respective litigants on the proceeds of said property be hereaftergdetermined. It is ordered that Ben. Onorato, auctioneer, sell at public auction, on the terms set forth in an order of sale herein granted, on the 20th of November, 1888, the real property herein inventoried, and that he have power to make title and sign all necessary deeds to the purchaser, and that, after deduction of the costs and expenses necessary for the sale of the property, it be turned over to said Mutual Loan and Building Company, the proceeds of said sale, to the ■extent that said company lay claim thereto, to be held by the said company until it shall have been finally determined by this Honorable Court, in a proper proceeding to be hereinafter brought by the administrator of the succession, whether the said company is and was entitled to retain the property or the funds realized by the sale *537 ■of said property, or has or had any claim, lien or privilege to or upon the same or any part thereof, or whether the money thus ordered to be paid over and held by said company belongs to the within succession, or whether the succession has any claim, lien or privilege to said money turned over to said company, or to any part or portion thereof.
The whole without prejudice to the rights of either of the litigants, the movers herein, and with full reservation of thé defences, rights, etc., the object hereof being solely to sell the property aforesaid, to prevent the destruction thereof, which is now in progress, owing to the same being now unoccupied and the insurance being in jeopardy.
A public auction was accordingly made, and the auctioneer filed his proces verbal on January 19, 1889, showing that the property was adjudicated to D. L. Bergamini for $2700.
The administrator in his account allowed the Mutual Loan and Building Company the sum of $2300.90. This company opposed the account, on the ground that under the contract with the deceased, Mrs. Latchford, it was entitled to have the account amended, and to be placed thereon as a privileged creditor for the amount of the proceeds ot the real estate, to the amount of $2564.42, with $30 notary and attorney charges and 8 per cent, on the whole total paid.
The Germania National Bank, claiming as an ordinary creditor, opposes the account on the ground that the Mutual Loan and Building Company has no privilege or mortgage on the real estate belonging to the succession. It also opposes the claim of Joseph Harz and denies that he is a creditor of the succession.
The opponent, August Bernau, asks that his fee of $300 be increased to $500.
There is no opposition to the claim of Charles Franke.
The administrator contends that the contract between Mrs. Latch-ford and the building company was usurious, as it added 10 per cent, premium 4o the capital invested by the company in the property of Mrs. Latchford, and that 8 per cent, per annum, payable in monthly instalments, had [been charged on the sum of $2640, when only $2400 had been invested.
The charter and by-laws of the company are in evidence. Mrs. Latchford in contracting with the company did so with reference to the same, and as the contract was made in strict conformity thereto, .they form a part of it. There is no allegation, nor is there any evi *538 dence that there was any departure from the charter or the rules- and regulations of the company.
Briefly stated the contract was that the company undertook to-build a house for Mrs. Latchford, for a certain sum. In order to secure the company against prior liens on the property, according to its-rules, it paid the vendor’s privilege on a certain special mortgage resting on the property. As a compensation for 'services rendered the company added 10 per cent, to the capital it invested in Mrs. Latchford’s property — the payment of the vendor’s privilege and the cost of the building. Mrs. Latchford agreed to sell the unimproved property to’the company for the sum of $750, the amount of the vendor’s note paid by the company.
The property was afterward to be transferred to Mrs. Latchford,. the price being the money so advanced for the clearing of title to the lot, and the cost of the building and the 10 per cent, added, the company to retain the vendor’s privilege and special mortgage, and giving Mrs. Latchford ten years in which to pay said price, in monthly instalments, bearing 8 per cent, interest per annum.
The company extinguished the mortgage note due by Mrs. Latch-ford for the purchase price of the lot upon which the building was-to be erected.
It amounted to - $750 00'
The building erected cost - - - 1,650 00
$2,400 00
To this was to be added 10 per cent. - - 240 00
$2,640 00
Which was the price Mrs. Latchford was to pay for the sale of the house and lot to her.
The contract was legal. There is nothing in it contrary to law. Mrs. Latchford had a perfect right to sell to the company, and the company to again sell to her for a price agreed upon.
The. company charged for its'services in erecting the building, as a compensation for time, labor and skill, and its entire responsibility in the superintendence and construction of the same, a premium of 10 per cent., which was to be added as a part of the price to the amount invested.
*539 It was not charged for the use of money, or for the creditor to forbear in the prosecution of his claim, but was a brokerage paid or charged at one time for the services of a builder. In no sense can it be considered as interest paid to a creditor for the use of his capital for a specified time.
Mrs. Latchford made several payments which, reduced the amount-she owed to the company to the sum of $2564.42.
For reason's satisfactory to Mrs. Latchford and the company, the property was not according to the original agreement sold to Mrs. Latchford. It seems the delay was at the request of Mrs. Latchford. At her death the property was placed upon the inventory in her succession. The legal title was in the company.
It has never parted with its title in the property to the succession. The equitable title, however, was in the succession as it had been in Mrs. Latchford, and the administrator, on complying with the terms of her agreement, could have the title transferred to the succession.
The company would, according to its rules and regulations and the agreement or contract with Mrs. Latchford, have retained the vendor’s privilege.
The property was sold by consent of parties, the proceeds to remain in lieu of the property. The company, by this agreement to sell, did not waive any of its rights, nor did the succession of Latchford acquire any. If the succession of Latchford desires the ownership of the property it must pay the price according to the terms agreed upon. Until this is done, the building company has a right to hold the property as a security for the debt.
As the property was sold by consent of all parties, and the title made to them, the judge a quo very properly rendered a decree so as to cover the agreement and protect the purchaser against the succession and the building company.
Joseph Hart was placed on the account as an ordinary creditor on a note for $1553.54, with interest and costs of protest. . H. Hamblock executed this note, which was indorsed by Mrs. Latchford.
The claim was rejected on the ground that Hamblock had gone into insolvency and had been discharged, the creditor, Harz, having been a party to the proceedings in the insolvency and having voted for the discharge of Hamblock, thus extinguishing the debt and releasing the surety, Mrs. Latchford.
*540 The proees verbal of the insolvent proceedings was offered in evidence and objected to by counsel for Harz, which objection was sustained. Subsequently the Germania Bank, offered an amended opposition, to which objection was made by Harz’s counsel. The amended opposition was allowed.
In the original opposition the bank denied that Harz is a creditor of the succession for the amount for which he was placed on the account or for any amount whatever.
The supplemental or amended opposition of the bank alleges that if Harz had ever been a creditor of Mrs. Latchford she had been released by the discharge in the insolvent proceedings of Hamblock.
The supplemental opposition was but an amplification of the original opposition by the setting out of the particular fact which destroyed the claim of Harz, which had been denied to exist. It was properly allowed. The prooes verbal of the insolvent proceedings was offered in evidence and admitted under the amended opposition. It was properly received for the purpose of showing the fact that Ham-block had been discharged, and how the creditors voted in the proceedings.
Harz contends that there was a majority in number and amount in favor of the discharge without his vote, and that when he voted there was not a sufficient number and amount to grant the discharge of Hamblock, and therefore the discharge was unaffected by his vote.
It is true the discharge was not granted alone by Harz, and the other creditors could have granted the discharge against the vote of Harz. But he voted for the discharge,'thus contributing to it. The discharge was the express will of all the creditors voting for it. It destroyed the debt as originally contracted in holding the debtor personally liable; released him, and placed it upon the proceeds of the sale of his effects.
The surety was discharged'. Lobdell vs. Niphler, 4 L. 294; Brown vs. Roberts, 14 An. 259.
The áttorney, Aug. Bernau, considering the amount of the succession, received a liberal fee, and it ought not to be increased.
Judgment affirmed.